**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| The Travelers Indemnity Company | ) | |
| | ) | CASE NO. 4:18-cv-00666 |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| vs. | ) | |
| | ) | **DEFENDANT/THIRD PARTY** |
| Air Vent Inc. | ) | **PLAINTIFF AIR VENT, INC.'S** |
| | ) | **MOTION FOR SUMMARY** |
| Defendant/Third Party Plaintiff | ) | **JUDGMENT** |
| | ) | |
| vs. | ) | **CERTIFICATION OF** |
| | ) | **COMPLAINCE WITH LOCAL** |
| Glaus, Pyle, Schomer, Burns & Dehaven, | ) | **CIVIL RULE 7.1 STANDARD** |
| Inc. dba GPD Group, et al. | ) | **TRACK PAGE LIMITATION** |
| | ) | **ATTACHED** |
| Third-Party Defendants. | ) | |

Defendant Air Vent, Inc. (sometimes AVI), moves this Court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, on plaintiff's subrogation product liability claims. In support of its motion, AVI submits and/or incorporates by reference:

1. The pleadings;

2. The deposition testimony of GPD architect Rodwell King, attached as Exhibit "A";

3. The Work Changes Proposal Request, attached as Exhibit "B";

4. The Atlas Nailable Roof Insulation Products Catalog, attached as Exhibit "C";

5. Air Vent Inc. Shinglevent II, shingle over ridge vent catalog, attached as Exhibit "D";

6. Cor-A-Vent system literature, attached as Exhibit "E";

7.  GAF Pro Field Guide for power vents and ridge vent, attached as Exhibit "F";

8.  Rooftec e-mail, attached as Exhibit "G";

9.  The deposition testimony of VEC employee Robert Light, attached as Exhibit "H";

10. The deposition testimony of USA Roofing foreman (Dustin Basmagy), attached as Exhibit "I";

11. The 30(B)(6) deposition testimony of USA Roofing (Jack Petsche), attached as Exhibit "J";

12. Change Order, attached as Exhibit "K";

13. Air Vent Installation Instructions, attached as Exhibit "L";

14. The 30(B)(6) deposition testimony of Air Vent (Robert Holland), attached as Exhibit "M";

15. The deposition testimony of plaintiff's warnings expert, William Vigilante, attached as Exhibit "N";

16. The 30(B)(6) deposition testimony of Foti Contracting (Jeffrey Paul Gillespie), attached as Exhibit "O";

17. The 30(B)(6) deposition testimony of RoofTec (Jerry Bartels), attached as Exhibit "P";

18. The deposition testimony of plaintiff's design expert, (W. Ronald Kilgore), attached as Exhibit "Q";

19. The expert report of plaintiff's design expert, (W. Ronald Kilgore), attached as Exhibit "R"; and,

20. Memorandum in Support.

Respectfully submitted,

s/*Robert S. Yallech*
Robert S. Yallech (0075494)
REMINGER CO., L.P.A.
11 Federal Plaza Central, Suite 1200
Youngstown, Ohio 44503
(330) 744-1311/ (330) 744-7500 (fax)
Email: ryallech@reminger.com
*Attorney for Defendant-Third Party Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................ iv

TABLE OF AUTHORITIES .......................................................... v

STATEMENT OF THE ISSUES TO BE DECIDED. .................................. vii

SUMMARY OF THE ARGUMENTS PRESENTED. .................................. vii

MEMORANDUM IN SUPPORT ...................................................... 1

    I.    Statement of the case taken from the pleadings. ................................ 1

    II.    Statement of the facts. ................................................................ 1

    III.    Law and argument.................................................................... 5

        A.    Inadequate instructions or warnings: ........................................ 5

            1.    The warnings provided were not read and heeded. .................... 6

            2.    Misuse ..................................................................... 10

            3.    Proximate cause .......................................................... 14

        B.    Design defect........................................................................ 16

            1.    Misuse. ..................................................................... 16

            2.    Feasible alternative design............................................... 17

    IV.    Conclusion. ........................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Bartel v, John Crane, Inc.*, 316 F.Supp.2d 603 ........................................... 10

*Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365 ......................................... 5

*Bowling v. Heil Co.* (1987), 31 Ohio St.3d 277 .......................................... 16

*Freas v. Prater Constr. Corp.,* 60 Ohio St.3d 6, 573 N.E.2d 27 (1991) ......... 7

*Hargis v. Doe* (1981), 3 Ohio App.3d 36.................................................... 15

*Hisrich v. Volvo Cars of N. Am.,* 226 F.3d 445 ........................................... 7

*Jacobs v. E.I. du Pont de Nemours & Co.* (C.A.6, 1995), 67 F.3d 1219 ....... 17

*May v. Citimortgage, Inc.*, 648 F. App'x 567.............................................. 5

*McGrath v. Gen. Motors Corp.*, 26 F. App'x 506 ........................................ 17

*Miller v. Uniroyal Technology Corp.* (C.A.6, 2002), 35 Fed.Appx. 216....... 17

*Mohney v. USA Hockey, Inc.*, 300 F. Supp. 2d 556, 2004 U.S. Dist. LEXIS

   759 (N.D. Ohio 2004) ............................................................................ 7

*Monroe v. Novartis Pharms. Corp.*, 29 F. Supp. 3d 1115............................. 17

*Mussivand v. David,* 45 Ohio St.3d 314 ..................................................... 5

*Ralph v. Dallas Corp.*, No. 91-3793, 1992 U.S. App. LEXIS 8484 (6th Cir.

   Apr. 22, 1992) ..................................................................................... 11

*Sapp v. Stoney Ridge Truck Tire,* 86 Ohio App. 3d 85................................ 10

*Seley v. G.D. Searle Co.*, 67 Ohio St. 2d 192, 423 N.E.2d 831.................... 15

*Sheets v. Schmidt & Assocs., Inc.,* 2003 Ohio 3198, 2003 WL 21414790 ....... 7

*Wade v. Diamant Boart, Inc.,* 374 F.Supp.2d 586 ....................................... 7

*Whiston v. Bio-Lab, Inc.,* 85 Ohio App.3d 300 ........................................... 15

*Zang v. Cones*, 2015- Ohio 2530 ............................................................... 17

**Statutes**

O.R.C. 2307.71 ........................................................................................ 16

O.R.C. 2307.75 .................................................................................. 16, 17

O.R.C. 2307.76(A)(1) ............................................................................ 5

**Rules**

FRCP 56 ................................................................................................ 5

**Treatises**

63 American Jurisprudence 2d (1984) 455, Product Liability, Section 356 .. 10

70 Ohio Jurisprudence 3d (1986) ............................................................ 10

76 A.L.R.2d 9, 66, Section 17 ................................................................ 10

**STATEMENT OF THE ISSUES TO BE DECIDED.**

1. Whether the power attic ventilator was defective due to inadequate warnings or instructions.

2. Whether the power attic ventilator at issue was defective in design.

**SUMMARY OF THE ARGUMENTS PRESENTED.**

1. The warnings and instructions were not defective because those provided were not read and heeded, the product was modified and used an in unforeseeable manner, and plaintiff failed to establish that the warnings and instructions that were provided were a proximate cause of the fire.

2. The power attic ventilator was not defective in design when it left the hands of the manufacturer because the product was modified and misused in an unforeseeable manner, plaintiff also failed to carry its burden of providing a technically feasible alternative design.

# MEMORANDUM IN SUPPORT

## I.     Statement of the case taken from the pleadings.

On June 30, 2016, a modified power attic ventilator caught fire on the roof of the Southington Local Middle School in Southington, Ohio. Southington Local School is a new K-12 campus with construction completed in 2011.  The fans at issue in this case are modified Air Vent Power Cool Plus 15 models manufactured by Air Vent.  There were thirteen modified Air Vent power attic ventilators installed on the roof of the Southington school.

After the fire, Travelers Indemnity Company paid out $625,277.89, for the loss. Travelers Indemnity subsequently sued Air Vent on a subrogation claim, alleging strict products liability causes of action.    AVI answered and removed the case to federal court based upon diversity of citizenship.  Air Vent also filed a Third-Party Complaint for indemnification and contribution against:

- GLAUS, PYLE, SCHOMER, BURNS, & DEHAVEN, INC., dba, GPD GROUP, the architects of the Southington project;

- FOTI CONTRACTING, LLC, the general contractor;

- VEC, INC. (VEC), the electrical contractor;

- USA ROOFING, INC., installed the power attic ventilators; and,

- Roof T.E.C., Inc. (dba, RoofTEC), the roofing consulting firm.

## II.    Statement of the facts.

The original contract specifications for the design of the roof on the Southington project did not call for the use of the power attic ventilators at issue in this case. (Exhibit A, p. 46, lns. 6-9).  Rather GPD subsequently

1

proposed a Work Changes Proposal Request signed by Rodwell King of GPD. (Exhibit B, authenticated at Exhibit A, p. 46, lns. 15-25; p. 47). RoofTec suggested this change to GPD--to add power attic ventilators--because they believed that the length of the roof from the soffit vents to the ridge vents was too long to allow for proper roof ventilation. (Exhibit A, page 23, lns. 14-21; p. 27, lns. 7-14).

Originally, GPD chose to utilize a system known as a nail base (or ventilated nail board) with soffit and ridge vents to ventilate the roof. (Exhibit A, page 25, lns. 20-23). Nail base is essentially two pieces of plywood, with Styrofoam spacers sandwiched in between, and includes a vapor barrier and insulation. (Exhibit C for relevant portions of the Atlas product brochure). This brochure for the Atlas nail base shows the type of ventilation to be used in conjunction with the nail base, namely soffit and ridge venting. (See pages 6, 8, 22, and 25 of Exhibit C). Air would enter the soffit vents, near the gutters, and travel through the one-inch air space in the nail base, and out of the ridge vents at the roof peak. (Id. at 22, 25). That was the original design of the ventilation for the Southington roof. (Ex. A, p. 25, lns. 20-23).

GPD designed the roof to use a 1" nail base ventilation space. (Ex. A, pg. 25, lns. 24-25, pg. 26, ln. 1). The Atlas Brochure provides options for a 1.5" as well as a 2" nail base (Ex. C, page 8). The larger spacers provide increased ventilation. (Id). RoofTec first suggested that GPD increase the spacers from 1" to 1.5" so as to increase the ventilation to the roof. (Ex.O, p. 123). GPD declined to do this. (Ex. A, pg. 26, lns. 2-24). Instead GPD

ultimately agreed with RoofTec to add thirteen Air Vent power attic ventilators to achieve increased ventilation. (Ex.A, lns. 22-25; p. 41, lns. 1).

There is no dispute that the instructions from both the nail base and the ridge vent manufacturers used on the Southington project—as proposed by GPD--state very clearly that power attic ventilators—as proposed by RoofTec and agreed to by GPD--are not to be used in that type of ventilation system. (See Exhibits D, authenticated at Ex. A, pp. 108-110; E, authenticated at Ex. A, pp. 111-113; and Ex. F, authenticated at Ex. A, p. 113-115).

RoofTec knew that using power attic ventilators in conjunction with ridge vents was also not recommended by AVI. (Exhibit G). Ridge vent manufacturers also warn against using power attic ventilators on a roof with ridge vents. (Ex. D, E F, and G). RoofTec told GPD that they should not use ridge vents in conjunction with powered attic ventilators. (Ex. A, pg. 31, lns. 5-13). In light of every product manufacturer instructing against such use, Roof T.E.C. suggested and GPD agreed, to add modified power to attic ventilators to the nail base (soffit and ridge vent) system. GPD admits, after reviewing the aforementioned product literature at deposition, that the modified power attic ventilators should not have been installed on the roof of the Southington project. (Ex. A, pp. 115, lns. 20-25, page 116, lns. 1-3).

GPD also ordered the extensive electrical modifications to the fan. (Ex. B). VEC completed these modifications prior to installation of the fans. (Ex. H, p.22, lns. 2-25). GPD ordered that VEC add a toggle switch to the power attic ventilators to act as a local disconnect, and to install them in such a manner so as to remain energized even if the GFCI receptacle is tripped. (Id.,

and exhibit B). GPD called out for, and VEC modified the power attic ventilators, with the addition of mounting brackets and conduit to be installed inside the fan housings. (Id). VEC mounted a T-fitting and electrical junction box to the fan as part of its electrical modifications. (Id). A humidistat/thermostat that is part of the power attic ventilator--and is supposed to be installed inside the attic of the structure per the manufacturer's instructions--was instead "zip tied' inside the housing of the fan by VEC, and left on the outside of the building. (Exhibit H pp. 98-99).

After these modifications, USA Roofing then installed the power attic ventilators on the roof in a manner that is completely contrary to the AVI instructions. (Ex. I, p. 106, lines 5-10). USA Roofing has decades of experience and knew how to install power attic ventilators. (Ex. I, at pp.15-16). They had installed them on dozens of other projects over the preceding decades. (Id). USA Roofing, however, had never installed power attic ventilators on a nail base before (Ex. J, p. 39, lines 3-11). In every other installation of power attic ventilators, USA Roofing had always cut through the roof deck into the attic. (Ex. I, pp. 14-16).

USA Roofing followed the instructions they were given by RoofTec and the GPD Change Order: to only cut through the first layer of the nail base, and to stop short of cutting a hole through to the attic so as to ventilate the nail base, not the attic. (See change Order, Ex. K, authenticated at Ex. A, p. 60, lns. 12-20; and Ex. I, pp. 37-40). This is not how AVI instructs on the installation and use of its power attic ventilators. (Ex. L, authenticated by Ex. M, p. 77, lns. 14-25; p. 78, lns. 1-3).

### III. Law and argument.

Where, as here, an action "was removed to federal court on the basis of diversity jurisdiction, we look to the substantive law of . . . the forum state, and apply federal procedural law." *May v. Citimortgage, Inc.*, 648 F. App'x 567, 571 (6th Cir. 2016) (citing *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)).

### A. Inadequate instructions or warnings.

In order to survive summary judgment under FRCP 56 on a failure to warn theory, a plaintiff must prove: (1) the product posed a risk of harm for which plaintiff seeks recovery; (2) the manufacturer knew, or reasonably should have known, of the existence of such risk; (3) the manufacturer failed to provide an adequate warning or instruction concerning that risk; and (4) the lack of an adequate warning was the cause of Plaintiffs' injuries. O.R.C. 2307.76(A)(1). Under Ohio law, the question of whether a manufacturer has a duty to warn is a question of law. *Mussivand v. David,* 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989).

Plaintiff's expert opines that Air Vent's failure to provide an adequate warning system was improper, unreasonably dangerous, and rendered the fan defective and unreasonably dangerous, and this failure to provide an adequate warning system deprived users of critical safety information they needed to properly install, use, and maintain the subject fan. Plaintiff's warning claim fails as a matter of law for multiple reasons.

## 1. The warnings provided were not read and heeded.

The warnings and instructions provided by AVI were clear. The first paragraph of the instructions states as follows:

> WARNING: Read all warning messages and instructions before starting installation of this fan. Failure to follow these safety instructions can result in injury or even death. If you need assistance in understanding these instructions or have questions or comments, please call (309) 692-6969.  (Exhibit L).

What is equally clear is that this warning and the instructions were not heeded by the design professionals or the installers of the power attic ventilators. (Ex. I, p. 33; p. 106, lines 5-10; see Change Order, Ex. K, authenticated at Ex. A, pg. 60, lns. 12-20; and Ex. I, page 37-40).

Plaintiff's warnings expert, Mr. Vigilante, would not know this, however, as he never reviewed the testimony of the installer, USA Roofing, prior to providing his opinions in this case.

Q. Okay.  Do you know who Jack Petsche is?
A. I do not.
Q. Did you review his deposition testimony?
A. I did not.
Q. Do you know who Dustin Basmagi [sic] is?
A. Not offhand.
Q. Did you review his deposition testimony?
A. I did not.
(Ex. N, page 18, lns. 6-13).

The purpose of Mr. Vigilante's investigation, according to him and his report, was to determine if "the manner in which the fan was installed was foreseeable to AVI."  (Id. at p. 16, lines 2-9).  Not having reviewed the testimony of the company and the employee who installed the fans would seem to make that task impossible.  Had he done so, he would have known that the warnings and instructions provided by AVI were not

followed, rather the power attic ventilators were installed according to the GPD Change Order and the instructions of RoofTec.

The evidence is clear that the installer did not read and heed the instructions and warnings that were provided by the manufacturer. Any claim that enhanced, or different warnings would have prevented the harm must fail as a matter of law. (See, *Mohney v. USA Hockey, Inc*., 300 F. Supp. 2d 556, 2004 U.S. Dist. LEXIS 759 (N.D. Ohio 2004), aff'd, 138 Fed. Appx. 804, 2005 FED App. 0599N, 2005 U.S. App. LEXIS 14373 (6th Cir. Ohio 2005), (Even assuming arguendo that the warnings, including that on the back of the hockey helmet, were inadequate, the presumption of proximate cause was rebutted, and a claim of a failure to warn failed, where the evidence directly established that a plaintiff did not read the warnings. The injured party's deposition testimony provided direct evidence he did not read any of the warnings). Multiple Ohio courts have held that where a plaintiff fails to read and/or follow clear instructions and where the accident would not have happened had the plaintiff followed the instructions, the plaintiff's strict products liability and negligence claims will fail for lack of the requisite proximate cause. *Wade v. Diamant Boart, Inc.,* 374 F.Supp.2d 586, 590 (N.D. Ohio 2005, Katz, J.) (citing *Freas v. Prater Constr. Corp.,* 60 Ohio St.3d 6, 573 N.E.2d 27 (1991), *Sheets v. Schmidt & Assocs., Inc.,* 2003 Ohio 3198, 2003 WL 21414790, at *3, 4, 5 (2003), *Mohney v. U.S. Hockey, Inc.,* 300 F.Supp.2d 556, 578 (N.D.Ohio 2004) (citing to *Hisrich v. Volvo Cars of N. Am.,* 226 F.3d 445, 451-53 (6th Cir.2000)).

The deposition testimony in this case establishes that the instructions and warnings contained therein were either not read or were not followed. GPD work changes proposal request and change order directed the installers on how to install the power attic ventilators. (Ex.B and K). GPD architect Rodwell King admitted—after being shown the product literature for nail base and ridge vent manufacturers-- that ridge vents and power vents should not be used on the same roof system. (Ex. A, pp. 115, lns. 20-25, p. 116, lns. 1-3).

VEC electrician Robert Light—who modified the fan wiring-- testified that he never saw the Air Vent instructions and warnings. (Ex. H, p. 46, lns. 23-25, p. 47, lns. 1).

USA Roofing installed the fans. (Ex. I, p. 33, lns. 6-8). Dustin Basmagy installed them as instructed to by RoofTec. (Id at lns. 9-11). Mr. Basmagy, the foreman on the job for USA Roofing testified that the instructions and the warnings mattered not; they "installed them according to the directions they were given by Rooftec." (Id).

Dustin Basmagy has been a roofer since 1979 (Id. at p. 9). He has installed power attic ventilators on roof two to three times a year since the 1980s. (Id. at p. 16). He has installed dozens of them. (Id. at p.15). These fans are used to ventilate hot air out of the attic. (Id). He typically installs them in a manner to ventilate the attic space. (Id. at p.16). But in this case, he was told to do it differently by third-party defendant Rooftec (Id. at p.17-18). He had never done on any other installation what he was told to do in this instance. (Id. at p. 21). He was instructed by Rooftec on how to install

these power attic ventilators.  (Id. at p. 21-22).  They wanted the power attic ventilator to vent the nail base rather than the attic. (Exhibit B).

Mr. Basmagy testified that the power attic ventilators were not installed according to the instructions provided by Air Vent.

Q.  We can agree that these power attic ventilators, as far as the Southington School is concerned, were not installed according to the directions that we just looked at; is that a fair statement?
A. Yes.
(Ex.I, p. 106, lines 5-10).

The owner of USA Roofing, Jack Pesche, a man in the roofing business since 1978 testified at the USA Roofing 30(B)(6) deposition that he cannot recall ever seeing an installation as was done on the Southington School.  (Ex.J, p. 39, lines 3-11).

The general trades contractor, Foti Contracting, on the Southington job understood that these power attic ventilators were installed according to the instruction provided by the architect, GPD.

Q. Was it your belief and understanding back at that time that the fans had been installed in accordance with the wishes and instructions of the architect?
A. It was my understanding, yes.
(Ex. O, p. 133, lns. 14-18).

RoofTec, the roofing consultant, agrees that, though the power attic ventilators should have been installed according to the instructions provided by Air Vent, the "instructions" that were actually followed were those of GPD architects.

Q. Can we agree that those powered attic ventilators were to be installed in accord with the manufacturer's installation instructions?
A. Yes. I have to caveat that a little bit because the instructions that we were following were the instructions, the architect provided and others provided the installation of this, and, yes, it should be -- the manufacturer should approve the installation before it's installed, generally, that's before the design, part of the design phase.
Q. But in this instance that wasn't done, was it?
A. I don't know.
(Ex. P, page 55, lns. 8-21).

Q. So your caveat, when I said that these powered attic ventilators should have been installed according to the manufacturer's installation instructions, your caveat would be yes, but if the architect provides us with other instruction, we follow those?
A. Yes. If the architect says this is the way it's going to be done, then that's the way it's done.
(Id. at page 57, lns. 17-25).

Even if a manufacturer failed to warn of a foreseeable product-related danger, "it is relevant to show whether the user of the product would have acted in the same manner had a proper warning been given." 63 American Jurisprudence 2d (1984) 455, Product Liability, Section 356. See, also, 70 Ohio Jurisprudence 3d (1986) 137, Negligence, Section 62; Annotation (1961), 76 A.L.R.2d 9, 66, Section 17.

There is no question that, regardless of the warnings and instructions provided by Air Vent, the tradesman and design professional either never saw the instructions or warnings, or if they did, were instructed on how to install the power attic ventilators by RoofTec, and the Change Order from GPD.

## 2. Misuse.

Ohio law is clear that a manufacturer is not required to foresee and warn of a consumer's abuse or misuse of a product. *Sapp v. Stoney Ridge Truck Tire,* 86 Ohio App. 3d 85, 99, 619 N.E.2d 1172, 1181 (1993). Manufacturers in Ohio are simply not required, nor would it be possible, to foresee every potential misuse of their products, then list them for all consumers to see. "There is no duty to warn of unknown and unknowable hazards." *Bartel v, John Crane, Inc*., 316 F.Supp.2d 603, 611-12 (N.D. Ohio 2004). The test focuses on the state of knowledge at the time the product left the manufacturer's hands and at the time the product was used. Where a plaintiff in a products-liability action "fail[s] to raise a genuine issue of fact

10

as to whether his injury was reasonably foreseeable," the defendant is entitled to summary judgment. *Ralph v. Dallas Corp.*, No. 91-3793, 1992 U.S. App. LEXIS 8484 (6th Cir. Apr. 22, 1992) (applying Ohio law).

In *Ralph,* plaintiff Ollie Ralph was injured while working with an Overhead Jifflox converter dolly attached to a tractor. Id. at 2. A pin-puller Ralph was attempting to insert between the two slipped out, causing him to fall and injure his shoulder. Ralph sued, alleging the dolly lacked sufficient warning labels. *Id.* at 3. The lower court granted summary judgment to the manufacturer, and Ralph appealed. *Id.* Though the Sixth Circuit did acknowledge there was a "complete lack of warnings" placed on the dolly, it held Ralph's actions were not reasonably foreseeable by the manufacturer because the dolly had been attached to a tractor using a pin-puller, which was not a standard practice, and the Court could find no evidence that the dolly had been intended to be used in such a way. *Id.* at 10-11. Because that particular method of attachment (and therefore the circumstances leading to plaintiff's injuries) was not foreseeable, the Sixth Circuit held the manufacturer did not have a duty to warn Ralph, and upheld summary judgment for the manufacturer. *Id.* at 11.

The evidence in this case makes clear that not only is Air Vent unaware of the type of misuse at issue here, but none of the designers, contractors, or the installer had ever seen this type of misuse before. AVI thus had no duty to warn. The only person claiming foreesability of using this type of product in this kind of roofing system is the one person involved

in this case who is admittedly not a roofing system expert. Mr. Vigilante testified as follows:

Q. And nail base applications use ridge vents; correct?
A. I'm not a roofing system expert, so I don't know what particular ventilation systems are used or not used with nail base systems.
(Exhibit N, page 52, lines 10-14).

Mr. Basmagy, who has forty years of experience in installing roofing systems, and the roofer for USA Roofing who installed the fans testified that the power attic ventilators were not installed according to the instructions provided by Air Vent. He testified as follows:

Q. We can agree that these power attic ventilators, as far as the Southington School is concerned, were not installed according to the directions that we just looked at; is that a fair statement?
A. Yes.
(Ex. I, p. 106, lns 5-10).

RoofTec instructed Mr. Basmagy on how to install these power attic ventilators. (Id. at p. 21-22). They, along with GPD, wanted the power attic ventilator to vent the nail base rather than the attic:

Q. Have you ever installed nail base before?
A. Yes.
Q. Many, many times?
A. Yes.
Q. Anyone ever ask you to vent the nail base in this way before?
A. With a power fan?
Q. Yes.
A. Never.
Q. Did you question that at all?
A. Just kind of shook my head. No, I didn't.
Q. Why did you shake your head?
A. Because we had never done it like that before.
Q. It struck you as odd.
A. It struck me as odd.
(Id. at p. 21, lns. 7-24).

The owner of USA Roofing, Jack Pesche, a man in the roofing business since 1978 testified at the USA Roofing 30(B)(6) deposition that he cannot recall ever seeing an installation as was done on the Southington School in this case.

Q. Earlier during Dusty's deposition he testified, and I'm going to paraphrase, he said he had never seen this done before where you put a powered attic ventilator on a roof in this fashion. Do you recall that testimony?
A. I do.
Q. Have you ever seen that done prior to this?
A. Not that I can recall.
(Jack Petche, p. 39, lines 3-11).

RoofTec, the roofing consultant on the job, testified as follows:

Q. Are you aware of any literature, whether it's put out by nail base manufacturers or by powered attic ventilator manufacturers or any literature anywhere that says you should use a powered attic ventilator with nail base?
A. No.
(Ex. P, p. 42, lns. 10-15).

GPD architects, the party that ordered the installation in the manner described, and the designer of Southington roof, is likewise unaware of any other projects where powered attic ventilators have been used in conjunction with ridge vents. (Ex. A, p. 35, lns. 7-10). Architect King also admitted his mistake in using power attic ventilators at deposition:

Q. Having read the installation instructions and the brochure materials on the ridge vents that you called out for in your specifications, it's pretty clear from those that ridge vents and powered vents shouldn't be used on the same roof system; isn't that fair?
MR. PANGRACE: Objection. Go ahead and answer.
A. Yes.
(Exhibit A, p. 116, lns. 20-25; p. 117, lns. 1-3).

None of the design professionals that design roofing systems for a living, nor the construction contractors, roofing consultants, or installers of roof systems, have ever seen this type of application—using a power attic ventilator to ventilate a nail base rather than an attic--before or since this job.

Air Vent has no duty to foresee, and then warn of this unforeseeable misuse of its product.

### 3. Proximate cause.

Because of the failure to read and heed the warnings and instructions provided by AVI, as well as the product misuse, the causal link in broken. Plaintiff's expert on warnings provides exemplar warnings he believes should have been provided in the instructions, product literature, and on the product itself. (Ex. N, p.53). Mr. Vigilante's exemplar warnings from his report are produced below:

Fire Hazard!
Failure to follow the instructions below can result in the fan motor
overheating and a fire:
• For residential use only.
• Do not use with vaulted/cathedral cellIng [sic] or compact roof systems.
• Do not use to ventilate nail base applications.
• Attic depth must be at least 6" deep.
• Ensure there is at least 5.0 square feet of unobstructed alr [sic] Intake,
• Do not obstruct area of fan body below blades.
• Do not modify fan body, fan motor, or control box.
• Thermostat control box must be mounted at least 12" from fan body.
• Do not allow fan to run continuously.
Illustration 1. Exemplar manual warning.

Vigilante testifies that the need for these warnings is premised upon his assumption that Air Vent is correct in its position in its answer that misuse and modification were the cause of the fire. (Ex. N, p.54). Without any opinion on what caused the fire, Vigilante's opinion that AVI's warnings were inadequate, or that his proposed warnings would have somehow prevented the fire, are based upon a mere assumption.

Mr. Vigilante testified that he had no opinion on the proximate cause of the fire, that his opinions were premised upon the answer of AVI.

Q. Mr. Vigilante, just so I'm clear, you underpin your report on the assumption in AVI's answer to the complaint regarding the misuse and alteration of the product being a cause of the fire. Is that fair?
A. Yes.
(Ex. N, p.101, lns. 5-10).

Q. So just to make sure I understand, you're not saying that AVI is correct in their assertion that improper installation is the cause of this fire, are you?
A. I am not.
(Ex. N, p. 27, lines 8-12)

Under Ohio law, a plaintiff asserting a products liability "claim[] based on failure to provide adequate warnings not only must convince the fact finder that the warning provided is unreasonable, hence inadequate, but he also must establish the existence of proximate cause between the [product] and the fact of the plaintiff's injury." *Seley v. G.D. Searle Co.*, 67 Ohio St. 2d 192, 423 N.E.2d 831, 838 (1981)." To impose liability on a manufacturer for a breach of a duty to warn, it must be shown that the breach was the proximate cause of the injury. *Whiston v. Bio-Lab, Inc.,* 85 Ohio App.3d 300, 619 N.E.2d 1047 (1993). "One of the hurdles, which is present in all products liability litigation, standing between proof of a negligent failure to warn and ultimate recovery[,] is the necessity of proof of a proximately causal relationship between the negligence and the injury." *Hargis v. Doe* (1981), 3 Ohio App.3d 36, 37, 443 N.E.2d 1008, 1010. Plaintiff's expert on warnings has no opinion on proximate cause.

Q. But you're not -- you're not giving credence to AVI's opinion that the improper installation was, in fact, the cause of the fire, are you?
A. I didn't analyze that. It's not something I intended to do.
(Ex. N, p. 26 lines 15-19).

Mr. Vigilante offers exemplary warnings for a product where he has no opinion on the proximate cause of the fire. Query how his exemplar warnings

could have prevented the fire when he has no opinion—only an "assumption"--on what caused it in the first place.

### B. Design defect.

Plaintiff also alleges the power attic ventilators were defective in design. Ohio Revised Code §2307.75 provides the framework for when a product is defective in design. A product is defective in design or formulation if, at the time it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to RC 2307.75(B) exceeded the benefits associated with that design or formulation as determined pursuant to O.R.C. 2307.75(C). Foreseeable risks are defined at RC 2307.71(6). *See* O.R.C. 2307.71(A)(6) (foreseeable risk includes only the risks associated with the "intended and reasonably foreseeable uses").

The fans in this case were equipped with thermal cut-offs (TCO). (Ex. Q, p.39, lns. 7-9; Ex. R, p.5). This safety feature is designed to de-energize the fan in the event of overheating. (Ex. R, pp.12-13). Plaintiff alleges that the thermal cut-off failed, thus allowing the fire to spread to the roof structure. (Plaintiff's complaint). Plaintiff claims that if the thermal protection were adequate, the fire would not have occurred. (Ex. R, p.4).

### 1. Misuse.

Ohio law is clear that modification or unforeseeable misuse is a complete defense to a claim of design defect. *Bowling v. Heil Co.* (1987), 31 Ohio St.3d 277, 282. The foregoing demonstrates clearly that the product Air Vent sold was not the same product that was installed at the Southington school project, nor was that product installed and used in a manner that was

reasonably foreseeable to Air Vent. In order to prevail on a design defect claim, it is plaintiff's burden to prove that the product was used in a reasonably foreseeable manner. The misuse and modifications break the causal link and bars recovery by the plaintiff.

## 2. Feasible alternative design.

There is another fatal flaw to plaintiff's design defect claim. A plaintiff in a design defect case bears the burden to demonstrate that a practical and technically feasible alternative design or formulation was available at the time the product left the manufacturer that would have prevented the harm caused without substantially impairing the usefulness or intended purpose of the product. O.R.C. 2307.75(F); *Jacobs v. E.I. du Pont de Nemours & Co.* (C.A.6, 1995), 67 F.3d 1219, 1242; *McGrath v. General Motors Corp.* (C.A.6, 2002), 26 Fed.Appx. 506; *Miller v. Uniroyal Technology Corp.* (C.A.6, 2002), 35 Fed.Appx. 216. Although subsection 2307.75(F) does not state that it is a plaintiff's burden to prove an alternative design, the Sixth Circuit has so held." *Monroe v. Novartis Pharms. Corp.*, 29 F. Supp. 3d 1115, 1124 (S.D. Ohio 2014) (citing *McGrath v. Gen. Motors Corp.*, 26 F. App'x 506, 510 (6th Cir. 2002)); *see also Zang v. Cones*, 2015-Ohio 2530, 34 N.E.3d 955, 961 (Ohio Ct. App. 2015) (defective design claim requires plaintiff to demonstrate feasible alternative design).

Plaintiff's expert on design defect, Ron Kilgore, never opined on feasible alternative designs or the need for additional safety devices in his report. He testified as follows:

Q.   We left off and we were talking about multiple TCOs being used in these types of fans.
Do you recall that?
A.   Yes.
Q.   I don't see that in your report anywhere.  Did I miss it?
A.   I don't think I listed reasonable alternative designs in my report.
Q.   Okay.  Any reason why not?
A.   I wasn't asked to.
Q.   Okay.
A.   And I think the bigger issue is that this one failed because it didn't work.  If it had
worked, it would have probably been fine.  We wouldn't have had a fire.
Q.   I was going to say that number 3 is kind of self-evident, that if only this had had
something that  would have prevented the fire, we wouldn't have had a  fire.  And you said
you didn't list the reasonable alternative designs because you weren't asked to; is that right?
A.   Yes.
(Ex. Q, p.48, lns. 19-25, p. 49, lns. 1-15).

Q.   And we talked about that a little earlier.  And I'll call it a belt and suspenders kind of
thing.  You're saying that, if you're going to use a TCO, you need to  use something in
addition to a TCO, whether it's another TCO or some other thermal protection; is that fair?
A.   Or some other protection scheme, whether it's thermal or current.
Q.   The fuse, right?
A.   Yes.
Q.   Okay.  And, again, that's not in your report?
A.   No.  But the fact that my opinion is that the thermal protection was inadequate clearly is
in my report and that it failed.
(Ex. Q., p. 57, lns. 16-25; p. 58, lns. 1-3).

Plaintiff has not provided any evidence of any practical and technically

feasible alternative design.  Plaintiff's expert on design defect did not make

mention of any feasible alternative designs in his expert report.  At deposition

he testified that he was not asked to provide an alternative design.  Plaintiff

has produced no expert testimony or report proposing a technically feasible

alternative design.

When asked about other power attic ventilators, Mr. Kilgore testified as follows:

Q.   Have you seen it done in any other power attic·ventilator?
A.   I have not and I have not looked for it. But, you know, the science is the same whether
      it's a box fan or a ventilator fan.  They are reasonably practical and are done in other
      small motors like this.
(Ex. Q, p. 50, lns. 12-18).

Q.   Is multiple TCOs adequate thermal protection?

A.   It can be if it's designed and installed correctly.

Q.   Okay.· And we don't know how we would have·designed multiple TCOs in this application, do we?

A.   I've not done that work.  I mean, it's not that hard, but --

Q.   Maybe not for you.  But you haven't done the work, right?

A.   That's correct.

(Id. at p. 65, lns. 19-25, p. 66, lns. 1-3).

Mr. Kilgore testified about the factors that need analyzed—none of which he was

asked to do, and none of which he did-- before choosing the additional thermal protection.

Q.   I want to jump back on something we talked about earlier, the two TCO thermal protection model.  And my understanding of that is -- well, let's use the motor in this case as an example. You have a Class A motor designed at 105 C, right?  Are you with me?

A.   Yes.

Q.   And we would have two TCOs.  Would one of them  be at 105 C?

A.   That would be a reasonable choice.

Q.   Okay.

A.   There are a lot of factors that go into that. You obviously want to not have nuisance tripping of a TCO.

Q.   Right.

A.   Because that would be a motor operation problem because you only have one opportunity.

Q.   Okay.  What are the other factors?

A.   Location.

Q.   Location of the --

A.   Of the TCO.

Q.   Right.

A.   And the ambient temperature.

Q.   Why is the location important?

A.   The location is important because you want it in high-thermal contact with the product or the components being protected.  In fact, in this one it is lodged between the primary and auxiliary windings, which is not a bad location at all because you would be getting thermal feedback from both sets of windings.  So I don't have any criticisms of the location.

Q.   Okay.

A.   But you would have to operate at that location and measure the expected temperature as part of your rating of the thermal protector.

Q.   I get you.

A.   During normal operation.

Q.   Yeah.  Because if at normal operation it's above105, you're not going to put a 105 there?

A.   Well, and you wouldn't use Class A insulation hopefully.  But yes, that's exactly right.

Q.   Okay.

A.   So there are a lot of factors that go into that selection.

Q.   Of the TCO?

A.   Yes.

Q.   Are there other ones that off the top of your head you can list out for me?  We have location.  We have that you don't want tripping too often if you put it too close to the --

A.   Well, you would want to know the normal operating temperature at that location.  And the TCO  manufacturers can sell you a TCO body with a thermocouple built in to make that measurement.

Q.   Okay.

A.   So you would install that instrumented TCO within the motor, operate that motor in various operating parameters to get an expected range of temperatures and then set your TCO above that.

Q.   Okay.

A.   And the second TCO typically above that.

Q.   Above that, right.

A.   Yes.

Q.   For reasons you discussed earlier.   Any other factors?

 A.  I think I've discussed the process that would incorporate lots of factors, loading on the motor is one.  You want to make sure that you have the expected range of the temperatures during various expected and foreseeable operations of the motor, including low ambient -- or high ambient temperature, low air flow, those types of things.

(Ex. Q, pp. 81, 82, 83, 84).

Plaintiff's expert assessed none of the above factors on this particular product to determine a technically feasible alternative design. Because it has not met its burden of offering a feasible alternative design, indeed, because their expert was not even asked to do so, plaintiff's design defect claim must fail as a matter of law.

**IV.   Conclusion.**

Plaintiff's subrogation claims for design defect and failure to warn fail as a matter of law.  The unforeseeable misuse, modification, and failure to provide a feasible alternative design are fatal to Travelers Indemnity Company's claims.

Respectfully submitted,

*s/Robert S. Yallech*
Robert S. Yallech (0075494)
REMINGER CO., L.P.A.
11 Federal Plaza Central, Suite 1200
Youngstown, Ohio 44503
(330) 744-1311/(330) 744-7500 (fax)
Email: ryallech@reminger.com
*Attorney for Defendant-Third Party Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been filed electronically this 1st day of November 2019. All parties will receive notice of this filing by operation of the Court's electronic filing system.

s/Robert S. Yallech
Robert S. Yallech (0075494)
*Attorney for Defendant-Third Party Plaintiff*

## CERTIFICATION OF COMPLAINCE WITH LOCAL CIVIL RULE 7.1 STANDARD TRACK PAGE LIMITATION

I hereby certify that the foregoing motion complies with Local Civil Rule 7.1 standard track page limitation.

s/Robert S. Yallech
Robert S. Yallech (0075494)
*Attorney for Defendant-Third Party Plaintiff*